**Mary P. DAHL–EIMERS, Plaintiff,**

v.

**MUTUAL OF OMAHA LIFE
INSURANCE COMPANY,
Defendant.**

**No. 92–30254–RV.**

United States District Court,
N.D. Florida,
Pensacola Division.

July 29, 1992.

Miles Davis, Pensacola, FL, and Wm. Dennis Brannon, Ft. Walton Beach, FL, for plaintiff.

Thomas E. Johnson, Omaha, NE, Ralph A. Peterson, Beggs & Lane, Pensacola, FL, for defendant.

## ORDER AND MEMORANDUM OPINION

VINSON, District Judge.

Plaintiff, Mary P. Dahl–Eimers, initiated this litigation for declaratory judgment, for injunctive relief, and for damages, against defendant, Mutual of Omaha Life Insurance Company. The plaintiff is insured under a policy of major medical expense coverage issued by the defendant. The plaintiff has Stage IV breast cancer, and desires to undergo a procedure identified generally as high dose chemotherapy with autologous bone marrow transplant ("HDC–ABMT"), utilizing three chemother-apy drugs known as Ifosfomide, Carboplatinum, and Etoposide ("I.C.E."). The issue presented is whether the HDC–ABMT treatment utilizing the I.C.E. drugs is "experimental" within the meaning of the policy's coverage.

(1) *The preliminary injunction standard.* In this Circuit, the four requisites for issuance of a preliminary injunction are well known: (a) a substantial likelihood that plaintiff will ultimately prevail on the merits; (b) that plaintiff will suffer irreparable injury unless the injunction issues; (c) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause to the opposing party; and (d) that the injunction, if issued, would not be adverse to the public interest. *See, e.g., Sofarelli v. Pinellas County,* 931 F.2d 718, 723–24 (11th Cir.1991). This matter was promptly set for hearing on the plaintiff's motion for a preliminary injunction because of the obvious need to deal quickly with the issue. For purposes of the preliminary injunction, only the first element needs to be considered, since the remaining three elements are established by the circumstances of the case.

(2) *The plaintiff's cancer and course of treatment.* Plaintiff is a forty-year-old female who resides in Destin, Florida. Her breast cancer was initially confirmed by biopsy on September 30, 1988. Following a right modified radical mastectomy, plaintiff embarked upon an initial course of chemotherapy and radiation treatments considered as standard or conventional therapy. At the end of that course of treatment, there was no clinical evidence that her disease was still existent. However, in August 1991, plaintiff developed pain in her right hip and was diagnosed with metastatic disease, for which she was treated with a drug called "Taxol" between September 1991 and March 1992. The cancer now appears to be in remission, although it is classified as "Stage IV metastatic breast cancer." Stage IV metastatic breast cancer is considered incurable by any known therapy. Plaintiff has now decided to explore the possibility of enrolling in the clinical trial of HDC–ABMT involving I.C.E. at

the H. Lee Moffitt Cancer Center and Research Institute at the University of South Florida in Tampa, Florida ("Moffitt").

(3) *The terms of the policy.* Under the major medical expense policy of insurance issued by the defendant, the insuring clause on page 4 specifies that the insurance company will reimburse the insured for "expenses" incurred. The expenses are defined as limited to "medically necessary" services or supplies. In turn, that is defined as follows:

A "Medically Necessary" service or supply means one which: (a) is appropriate and consistent with a diagnosis in accord with accepted standards of community practice; (b) is not considered experimental; and (c) could not have been omitted without adversely affecting the insured person's condition or the quality of medical care.

The critical term for purposes of this case is "experimental." The plaintiff contends that it is an ambiguous term, while the defendant says that it is not. Under Florida law, construction of the terms of an insurance contract is a question of law to be resolved by the court. *Epstein v. Hartford Casualty Insurance Co.,* 566 So.2d 331, 332–33 (Fla. 1st DCA 1990). Further, courts are to give the language within an insurance policy a practical and sensible interpretation in accordance with the natural meaning of the words employed. Construction of the policy language must be:

... by the rule of reason and the principle that even insurance policies must be given practical, sensible interpretations in accordance with the natural meaning of the words employed. Obviously, the rule that ambiguities must be construed against the insurer applies only when a genuine inconsistency, uncertainty, or ambiguity in meaning remains after resort to ordinary rules of construction; it does not allow courts to rewrite the contracts, add meaning that is not present, or otherwise reach results contrary to the manifest intention of the parties.

*Allstate Insurance Co. v. Shofner,* 573 So.2d 47, 49 (Fla. 1st DCA 1990) (citations omitted).

(4) *The HDC–ABMT treatment.* Among cancer researchers, it is generally believed that higher doses of chemotherapy drugs may result in destruction of a greater portion of the cancer cells. However, since the chemotherapy drugs are extremely toxic, the dosage for each of these drugs is limited by the maximum that the human body can tolerate. A significant limiting factor is that very high doses substantially destroy the bone marrow which, ordinarily, is fatal since the bone marrow provides necessary red blood cells, white blood cells, and platelets.

Thus, a major research effort in recent years has been an attempt to increase the maximum tolerated dosage by means of protecting a small portion of the patient's own ("autologous") bone marrow. A major break through was being able to remove, freeze, and reuse the bone marrow. The first trials of this process, "HDC–ABMT," in cancer treatment involved patients with "diffuse" tumors such as leukemia or lymphoma. Through a series of laboratory and clinical experiments, researchers were able to determine what specific patients were benefitted by specific drugs or drug combinations at specific dose levels. As a result, HDC–ABMT for certain diffuse tumors is now recognized as standard therapy. There is no standard therapy recognized today, however, for a "solid" tumor such as breast cancer among women. Over the past few years, perhaps ten to twenty university-affiliated medical institutions have initiated active research programs for HDC–ABMT treatment of breast cancer. These programs involve a limited number of patients at various stages of the disease, and each program generally involves a testing of a particular combination of drugs at various dosage levels, with and without bone marrow purging. Despite high expectations from these clinical tests, the data available from the experiments conducted to date are inconclusive. The results of approximately 1,000 test patients using about six different combinations of chemotherapy drugs are now known to the medical community. For purposes of this case, it is important to note that there is no known published data for the I.C.E. combi-

nation of drugs on breast cancer, for which plaintiff seeks treatment at the Moffitt Center.

(5) *Medical Research Requirements.* The requirements of medical research involving human subjects is regulated by the federal government under regulations promulgated by the Department of Health and Human Services and the Food and Drug Administration. Medical experiments with human subjects are generally known within the profession as "clinical trials." Clinical trials are divided into "phases" which are defined in terms of the research objective and the methodology. Phase I clinical trials are the earliest stage of the testing of a drug or procedure, and follow test tube and animal research. The primary objective of a Phase I trial in the context of drug testing is to determine the toxicity and maximum tolerated dosage of the substance. Dosages are escalated among groups of patients until a dosage is reached where toxicities prove unacceptable.

In Phase II trials, scientific information is gathered regarding the medical effectiveness or ineffectiveness of the procedure. Phase II trials are designed to attempt to determine whether the experimental procedure produces a biological response such as shrinkage of the tumor, and the extent and duration of that response. Phase II clinical trials are statistically designed to involve the fewest number of research subjects necessary to achieve the statistical reliability of the experiment's results.

Finally, Phase III trials are conducted to attempt to compare the medical result of the experimental therapy to a standard therapy or to no therapy at all, in order to allow for reasonable scientific comparison and test conclusions.

All of these testing procedures are implemented through entities called Institutional Review Boards ("IRBs"). An IRB must be established and maintained by each institution engaged in medical research involving human subjects. Every research project must be submitted to the controlling IRB via a document known as the "protocol." The protocol sets out, *inter alia,* eligibility requirements for subjects, the number of

subjects to be enrolled, and the objective of the research project. Full disclosure is required.

Each participant in a research project is required to be fully informed, and this is done via a specialized document known as the "informed consent" document. The Code of Federal Regulations sets out what must be included in the "informed consent" document.

(6) *The "protocol" document and the "informed consent" document involved in this case.* The protocol document for the Moffitt Cancer Center, for which the plaintiff seeks treatment, is in evidence, as is her informed consent document. As the protocol's title reflects, it is a "Phase I–II study of intensive-dose [I.C.E.] combination chemotherapy." It contemplates dosage levels escalating up to four times the approved dosage limit of Ifosfomide; up to fifteen times the approved dosage of Carboplatin; and up to three and one-half times the approved dosage of Etoposide.

The protocol sets out the purpose of the study in paragraph (2.4): "The present study proposes that the combination of drugs . . . [I.C.E.], which represents a novel multi-agent regimen, followed by autologous bone marrow transplantation, be evaluated in a dose escalation fashion. . . ." A number of types of cancers are to be included within the study, including "metastatic breast cancer responding to therapy." The concluding sentence of paragraph (2.4) reads: "A major goal will be to define the maximum tolerated dose of this combination of drugs."

In the "informed consent" document, the clinical trial participant is required to acknowledge "I understand that the investigators will be measuring how well my disease responds to the drug as well as any side effects to the drugs on the study." The document sets out that participation as a research subject "is voluntary," and "there is no guarantee that this will be successful." The clinical trial is referred to throughout the document as a "study."

The estimated cost of the plaintiff's participation in the Moffitt Center's clinical trial is approximately $150,000. Since

there is apparently no outside funding for this type of clinical research at the Moffitt Center, the participants (or the participants' insurance companies, if applicable) are expected to pay. Naturally, the medical research team members are most interested in getting the appropriate representation of participants into the clinical tests. Therefore, it must be recognized that the testimony and affidavits of such medical personnel have a decided bias in favor of attempting to get the insurance companies to fund this research.

(7) *Analysis.* Both sides have submitted numerous reported court decisions dealing with the question of whether HDC–ABMT is within the scope of coverage of a medical insurance policy. Although some of the reported decisions deal with the subject in such a general fashion as to be completely irrelevant to what I consider to be the critical inquiry, and others are clearly distinguishable because of the different types of cancer involved or the different insurance policy clauses being applied, the cases are about equally divided on the issue.

The inquiry in this case is plainly fact-specific, and must be resolved by applying the term "experimental" to the actual procedure being contemplated by the plaintiff for her treatment. Within this context, the term "experimental" is not ambiguous. It has a plain and ordinary meaning which can be applied to the circumstances and facts of this case without any conflict. As defined in Webster's Ninth New Collegiate Dictionary (Miriam–Webster, Inc. 1985), an "experiment" is "an operation carried out under controlled conditions in order to discover an unknown effect or law, to test or establish a hypothesis, or to illustrate a known law." In turn, "experimental" means "relating to or having the characteristics of experiment: TENTATIVE [still in the "experimental" stage]".

Under the facts of this case, the inescapable conclusion is that plaintiff's projected treatment is "experimental." Both the protocol document and the informed consent document associated with the clinical trial at the Moffitt Center leave no doubt about the nature of the study. It involves the testing of three chemotherapy drugs which have not previously been utilized together in the HDC–ABMT regimen. It is clearly an attempt to try to isolate the maximum dosages that can be tolerated among a variety of types of cancers. It sets out a prescribed regimen of dosages that will be applied to all of the study's participants, without regard to any individual characteristics or peculiarities. Under the protocol, each patient "gets the same predetermined treatment, the same dose, the same frequency." [*See* Herberman deposition, p. 108] It is this characteristic of the study for which the plaintiff seeks to be enrolled that easily distinguishes it from any "treatment." Accepted treatment "tends to be an individualized approach," in which the "physician will adjust the dose or on a frequency of administration based on a variety of situations and their intuition about what would be the optimum treatment for that given patient." [*Id.*] On the other hand, in protocol research, "one needs to standardize as much as possible the treatment amongst all the patients who are entered so that one could compare as much as possible the results from one patient to the next." [*Id.* p. 109–109] Presumably, no treatment could be ethically prescribed for a patient by a physician unless there was some expectation that it was potentially beneficial to the patient. Thus, I reject any purported definitions framed by other courts or experts which attempt to read an ambiguity into the term "experimental" on the basis of whether it benefits a patient. That type of analysis simply is wrong.

(8) *Conclusion.* The parties have submitted an abundance of evidentiary material in connection with this matter, and have also relied upon numerous reported court decisions, as discussed above. However, I do not feel it is necessary to further discuss the evidentiary material or the legal authorities in any detail, for the issue is quite narrow and quite focused. The plaintiff, like approximately 50,000 other breast cancer patients each year, is bravely facing a situation where her alternatives are few, and none are particularly attractive. The clinical study in which she seeks to be enrolled is definitely "experimental" as ap-

plied to the I.C.E. combination of chemotherapy drugs for treatment of breast cancer. The insurance policy does not provide coverage for treatment that is "experimental." I am certainly sympathetic to the plaintiff's plight and her rational desire to pursue any path of treatment that holds any promise of success. Yet, in truth, whether the I.C.E. combination of drugs has a beneficial—or deleterious—effect upon breast cancer that has progressed to Stage IV is simply not known. That is, understandably, why the Moffitt Center desires to enroll the plaintiff in its study. It is equally understandable why the plaintiff, after giving due consideration to all her alternatives, may want to pursue that course of treatment.

It is unfortunate that adequate funding for clinical trials of drugs and treatments for catastrophic illnesses is not available from the federal government. But such funding is quite limited, and is thinly spread among thousands of competing programs involving literally hundreds of various illnesses and diseases. Thoughtful people need to ponder how this problem can be fairly resolved.

Since it does not appear that the plaintiff has a substantial likelihood of prevailing on the merits of this case, the motion for a preliminary injunction must be, and is, DENIED.

In accordance with Title 28, United States Code, Section 1292, I certify that this order involves a controlling question of law as to which there is substantial ground for difference of opinion, and an immediate appeal may materially advance the ultimate termination of the litigation. Time is also of the essence.